M. KENDALL DAY, Chief
Asset Forfeiture and Money Laundering Section (AFMLS)
MARY BUTLER
Chief, International Unit
WOO S. LEE
Deputy Chief, International Unit
KYLE R. FREENY
Trial Attorney
Criminal Division
United States Department of Justice
  1400 New York Avenue, N.W., 10th Floor
  Washington, D.C. 20530
  Telephone:  (202) 514-1263
  Email:  Woo.Lee@usdoj.gov

EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
JOHN J. KUCERA (CBN: 274184)
CHRISTEN A. SPROULE (CBN: 310120)
Assistant United States Attorneys
Asset Forfeiture Section
  312 North Spring Street, 14th Floor
  Los Angeles, California 90012
  Telephone:  (213) 894-3391/(213) 894-4493
  Facsimile:  (213) 894-7177
  Email: John.Kucera@usdoj.gov
      ___Christen.A.Sproule@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>       v.<br><br>"THE WOLF OF WALL STREET"<br>MOTION PICTURE, INCLUDING<br>ANY RIGHTS TO PROFITS, | No. CV 16-5362<br><br>EX PARTE APPLICATION FOR POST-<br>COMPLAINT RESTRAINING ORDER;<br>MEMORANDUM OF POINTS AND<br>AUTHORITIES<br><br>[Proposed Order Lodged Concurrently] |

ROYALTIES AND DISTRIBUTION PROCEEDS OWED TO RED GRANITE PICTURES, INC. OR ITS AFFILIATES AND/OR ASSIGNS,

Defendants.

[18 U.S.C. § 983(j)]

The United States, by and through the United States Department of Justice, hereby applies to this Court, pursuant to 18 U.S.C. § 983(j), for a restraining order to preserve any and all rights, presently-held and future, for the motion picture titled "The Wolf of Wall Street" belonging to Red Granite Pictures, Inc.,[1] a film production company located at 10990 Wilshire Boulevard, 8th floor, Los Angeles, CA 90024 ("Red Granite Pictures"), including copyright and intellectual property rights, as well as the right to collect and receive any revenue or receipts (whether gross or net), royalties, and/or other proceeds resulting from Red Granite Pictures' ownership or interest, whether in whole or part, in connection with Red Granite Pictures' role in producing, distributing, or otherwise financing or promoting "The Wolf of Wall Street" generated from the date of this Order until further Order of the Court, whether paid to Red Granite Pictures or to its affiliates and/or assigns, as well as any and all monies received or held by Red Granite Pictures or its affiliates and/or assigns at the time of entry of this Order, whether as cash or held in any account in any financial institution, which constitutes any and all proceeds, to include but not limited to any revenue or receipts (whether gross or net), royalties, and/or other proceeds resulting from Red Granite Pictures' ownership or interest, whether in whole or part, in connection with Red Granite Pictures' role in

---

1.    Red Granite Pictures is a movie production company co-founded by Riza Shahriz Bin Abdul AZIZ ("AZIZ") in 2010, which produced several major motion pictures, including "The Wolf of Wall Street," "Friends with Kids," and "Dumb and Dumber To."  Red Granite Pictures was incorporated in California on September 30, 2010, as Red Granite Productions and changed its name to Red Granite Pictures on or about June 6, 2011.  Red Granite Pictures' website lists AZIZ as the founder, chairman, CEO, and producer.

producing, distributing, or otherwise financing or promoting "The Wolf of Wall Street," or related to or derived from same (all collectively referred to hereafter as the "Restrained Property").

The Restrained Property is a defendant named in a Verified Complaint for Forfeiture <u>In</u> <u>Rem</u> ("the Complaint"). The Government contends that the allegations of the Complaint establish probable cause to believe that Restrained Property is subject to forfeiture to the United States.

The proposed restraining order provides that the United States Marshals Service ("USMS") be appointed as the Monitor of the Restrained Property and all financial accounts associated with the Restrained Property.

This application is based on the accompanying memorandum of points and authorities, the Verified Complaint, all pleadings and papers on file in this action, and on

///
///

3

such further evidence and argument that the Court may entertain at any hearing on this application.

Dated: July 20, 2016

Respectfully submitted,

M. KENDALL DAY
Chief, AFMLS

EILEEN M. DECKER
United States Attorney

_____/s/*Christen A. Sproule*_____
JOHN J. KUCERA
CHRISTEN A. SPROULE
Assistant United States Attorneys

WOO S. LEE
Deputy Chief, AFMLS
KYLE R. FREENY
Trial Attorney, AFMLS

Attorneys for Plaintiff
UNITED STATES OF AMERICA

1

2

## I.      INTRODUCTION

On July 20, 2016, the United States filed the Complaint, alleging that all right to and interest in "The Wolf of Wall Street" belonging to Red Granite Pictures, Inc. a film production company located at 10990 Wilshire Boulevard, 8th floor, Los Angeles, CA 90024 ("Red Granite Pictures"), including copyright and intellectual property rights, as well as the right to collect and receive any revenue or receipts (whether gross or net), royalties, and/or other proceeds resulting from Red Granite Pictures' ownership or interest, whether in whole or part, in connection with Red Granite Picture's role in producing, distributing, or otherwise financing or promoting "The Wolf of Wall Street" (hereinafter, the "WOLF OF WALL STREET RIGHTS") are forfeitable to the United States.  "The Wolf of Wall Street" is a motion picture produced by Red Granite Pictures and released in the United States on December 25, 2013.  The Complaint alleges that the WOLF OF WALL STREET RIGHTS are property that constitute, or were derived from, proceeds traceable to one or more violations of:  a foreign offense involving the misappropriation of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), receipt of stolen money (18 U.S.C. § 2315); (iv) wire fraud (18 U.S.C. § 1343); and (v) a conspiracy to commit such offenses.  The Complaint also alleges that the WOLF OF WALL STREET RIGHTS are property that are involved in, and are traceable to property involved in, one or more money laundering transactions or attempted transactions in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(2)(B), and 1957, and a conspiracy to commit such offenses in violation of section 18 U.S.C. § 1956(h).

In the Complaint, the Government alleges that the production of the motion picture "The Wolf of Wall Street" was financed with the proceeds of a conspiracy by multiple individuals, including public officials and their associates, to misappropriate and fraudulently divert billions of dollars from 1Malaysia Development Berhad ("1MDB"), a strategic investment and development company wholly-owned by the government of Malaysia, including by defrauding foreign banks and by sending foreign wire communications in furtherance of the scheme, and thereafter to launder the proceeds of that criminal conduct, including in and through U.S. financial institutions. The proceeds generated by "The Wolf of Wall Street" represent proceeds of the misappropriation scheme alleged in the Complaint, as well as property involved in or traceable to property involved in money laundering.

The Government seeks a restraining order to preserve the presently held and future revenue, receipts, royalties and proceeds resulting from Red Granite Pictures' ownership interest in the motion picture "The Wolf of Wall Street" during the pendency of this action while enabling the continued distribution of "The Wolf of Wall Street" (i.e., the Restrained Property).

## II.  SUMMARY OF THE SCHEMES[2]

### A.  *The Good Star Scheme*

As one of its first investment projects, 1MDB entered into an agreement in September 2009 with PetroSaudi International ("PetroSaudi" or "PSI"), a private Saudi Arabia-based oil services company, to form a joint venture called 1MDB PetroSaudi Ltd. ("the 1MDB-PetroSaudi JV" or "Joint Venture").  The stated purpose of the Joint Venture was to exploit certain energy concession rights in Turkmenistan and Argentina that PetroSaudi purported to own.  Under the terms of the agreement, (a) 1MDB agreed to invest $1 billion in cash in the Joint Venture in exchange for a forty percent (40%) equity interest in the Joint Venture, and (b) PetroSaudi agreed to give the Joint Venture

---

[2] The Verified Complaint filed on July 20, 2016, provides a more detailed description of this misappropriation and money laundering scheme.

6

the mineral extraction concessions it purportedly owned in Turkmenistan and Argentina in exchange for a sixty percent (60%) equity interest in the Joint Venture.  PetroSaudi's energy concession rights were allegedly valued at approximately $2.7 billion.  (Compl. ¶ 40.)

Both 1MDB's Board of Directors and Bank Negara, Malaysia's Central Bank, approved the transfer of $1 billion to the Joint Venture.  However, as set forth in greater detail in the Verified Complaint (Dkt. #1), LOW Taek Jho, a/k/a Jho Low ("LOW") and his associates caused $700 million of the $1 billion that was to be invested in the Joint Venture to be sent to an account at RBS Coutts Bank in Zurich ("RBS Coutts") held in the name of Good Star Limited ("Good Star Account").  (Id. ¶ 41.)

Between May and October 2011, approximately $330 million in additional funds were wired at the direction of 1MDB officials to the Good Star Account, purportedly in connection with a financing agreement executed between 1MDB and the 1MDB-PetroSaudi JV.  (Id. ¶ 42.)

Although 1MDB officials represented, including to Deutsche Bank in Malaysia, that Good Star was a wholly-owned subsidiary of PetroSaudi, this was not true. According to banking records, Good Star was a company controlled by LOW, and LOW was also the Good Star Account's beneficial owner and sole authorized signatory.  At the time, LOW, a Malaysian national, was a 29-year-old with no official position with 1MDB or PetroSaudi.  (Id. ¶ 8, 43.)

### B.    The AABAR-BVI Scheme

In 2012, more than $1.3 billion in 1MDB funds raised in two separate bond offerings were misappropriated and fraudulently diverted to bank accounts in Switzerland and Singapore.  In issuing these bonds, 1MDB participated in the publication and disclosure of two offering circulars that contained material misrepresentations and omissions relating to:

      a.     How the proceeds of these bond issuances would be used;

b.  The nature of the relationship between the issuer (*i.e.*, subsidiaries of 1MDB) and the bond's third-party guarantor (*i.e.*, the International Petroleum Investment Company of Abu Dhabi ("IPIC")); and

c.  The existence of any related-party transactions connected to the 2012 bond issuances, including that 1MDB officials, IPIC officials, and their associates would personally benefit from the issuance of these bonds.  (Id. ¶ 112.)

After more than $1 billion had been misappropriated from 1MDB between 2009 and 2011 in the Good Star Scheme, 1MDB needed to raise additional capital to fund its operations.  As set forth in greater detail in the Complaint, 1MDB engaged Goldman Sachs International ("Goldman") to arrange and underwrite two separate bond offerings in 2012.  One of the stated purposes of the 2012 bond issues was to raise funds to allow 1MDB to acquire certain energy assets.  (Id. ¶ 113.)

IPIC, an investment fund wholly-owned by the government of Abu Dhabi in the United Arab Emirates ("U.A.E."),[3] guaranteed, either directly or indirectly, both 2012 bond offerings and in exchange, a nominated subsidiary of IPIC was granted an option to purchase a minority share of the energy assets acquired by 1MDB.  (Id. ¶ 114.)

Almost immediately after receiving the proceeds of each of the 2012 bond issues, 1MDB wire transferred a substantial portion of the proceeds – totaling approximately $1.367 billion between the two bond sales, or more than forty percent of the net proceeds raised – to a Swiss bank account belonging to an entity called Aabar Investments PJS Limited, a British Virgin Islands-registered corporation (referred to herein as "Aabar-BVI") that bears a similar name to a legitimate subsidiary of IPIC, called Aabar Investments PJS (referred to herein as "Aabar").  At the time of these transfers, Khadem Abdulla al-QUBAISI ("QUBAISI") was the Managing Director of IPIC and the Chairman of Aabar; and Mohamed Ahmed Badawy Al-HUSSEINY ("HUSSEINY") was the CEO of Aabar.  QUBAISI and HUSSEINY were also directors of Aabar-BVI. (Id. ¶ 115.)

_____

[3] The United Arab Emirates is a sovereign nation in the Arabian Peninsula, comprising seven separate emirates, including the Emirate of Abu Dhabi ("Abu Dhabi").

In their audited financial statements for the year ending on March 31, 2014, 1MDB booked their substantial payments to Aabar-BVI as an asset rather than a payment, describing it as a "refundable deposit . . . held aside as collateral for the guarantee" that IPIC provided for the 2012 bonds.  (Id. ¶ 116.)

Following the dismissal of QUBAISI and HUSSEINY from their positions at IPIC and Aabar in 2015, IPIC and Aabar have recently clarified that Aabar-BVI is not owned by either entity.  (Id. ¶ 117.)

The Swiss bank account belonging to Aabar-BVI ("Aabar-BVI Swiss Account") was used to siphon off proceeds of the two 2012 bond sales for the personal benefit of individuals affiliated with IPIC, Aabar, and 1MDB, as well as their associates. Beginning within days of receiving funds from 1MDB, Aabar-BVI transferred a total of approximately $636 million to the Singapore bank account held by Blackstone Asia Real Estate Partners ("Blackstone Account").  During this same time period, Aabar-BVI transferred, through multiple overseas investment funds, an additional approximately $465 million to the Blackstone Account.  The beneficial owner of the Blackstone Account was identified in bank records as "Eric" TAN Kim Loong ("TAN"), a Malaysian national and an associate of LOW.  (Id. ¶ 118.)

Shortly after receiving proceeds of the two 2012 bond sales from 1MDB, Aabar-BVI transferred $238,000,000 to a Singapore bank account belonging to Red Granite Capital, an entity owned by Riza Shahriz Bin Abdul AZIZ ("AZIZ").  AZIZ is a relative of MALAYSIAN OFFICIAL 1[4] and a friend of LOW.  Among other things, AZIZ used these funds to purchase luxury real estate in the United States and the United Kingdom for his personal benefit, and to fund his movie production company, Red Granite Pictures.  1MDB has disclaimed any investment interest in Red Granite Pictures.  (Id. ¶ 120.)

---

[4]  MALAYSIAN OFFICIAL 1 is a high-ranking official in the Malaysian government who also held a position of authority with 1MDB.

III.  **TENS OF MILLIONS OF DOLLARS IN FUNDS DIVERTED FROM 1MDB WERE USED TO FUND RED GRANITE PICTURES AND TO PRODUCE "THE WOLF OF WALL STREET."**

A.  *LOW Distributed Millions in 1MDB Funds from Good Star to Red Granite Pictures to Fund "The Wolf of Wall Street."*

Funds from the Good Star Account were transferred into and through various bank accounts at City National Bank in Los Angeles associated with Red Granite Pictures, and that money was ultimately used to fund the production of "The Wolf of Wall Street," a motion picture produced by Red Granite Pictures and released in the United States on December 25, 2013.  These funds are directly traceable to the $700 million wire transfer and $330 million wire transfer unlawfully diverted from 1MDB to the Good Star Account.  (Id. ¶ 385.)

As set forth above, approximately $1.03 billion was diverted from 1MDB to the Good Star Account between approximately September 30, 2009 and October 25, 2011. (Id. ¶ 386.)

Bank account records from City National Bank and correspondent bank records from J.P. Morgan Chase show that two wires totaling $10,173,104 were sent from the Good Star Account to a bank account at City National Bank in Los Angeles that was designated as the "Operating Account" for Red Granite Pictures ("RGP Operating Account").  AZIZ is a signatory on this account.  (Id. ¶ 387.)

More specifically, first, on or about April 12, 2011, a wire for $1,173,104 was sent from Good Star to the RGP Operating Account.  The notation on this wire read: "INVESTOR ADVANCES OF USD 1 173 104 OUT OF USD 5 000 000 to RED GRANITE (MOVIES)."  Second, on or about September 10, 2012, a wire for approximately $9,000,000 was sent from Good Star to the RGP Operating Account.  The notation on this wire read:  "ADVANCES FOR WOLF OF WALL STREET MOVIE FOR ACHL."  (Id. ¶ 388.)

On or about September 11, 2012, one day after this second wire transfer, approximately $9,015,191 was transferred from the RGP Operating Account to another

City National Bank account held in the name of Red Granite Pictures ("RGP Pictures Account").  On or about September 12, 2012, the same amount – $9,015,191 – was transferred from the RGP Pictures Account to yet another account at City National Bank held in the name of TWOWS LLC ("TWOWS Account #1").  (Id. ¶ 389.)

"TWOWS" is an acronym for "The Wolf of Wall Street," and TWOWS LLC was a special purpose vehicle ("SPV") created by Red Granite Pictures to produce "The Wolf of Wall Street."  Delaware state records show that TWOWS LLC was formed on or about April 16, 2012, and California state records show that AZIZ is one of the entity's managers.  It is common in the film industry to create an SPV, such as a limited liability corporation, for the purpose of producing a film.  It is also common to open a separate bank account or accounts in the name of that SPV and to use the funds in that account to finance the film's production.  (Id. ¶ 390.)

City National Bank records show that the TWOWS Account #1 was used to pay expenses associated with the production of "The Wolf of Wall Street."  In or around April 2013, the TWOWS Account #1 was closed and the balance of the funds transferred to another account at City National Bank also held in the name of TWOWS LLC (hereinafter, "TWOWS Account #2").  The TWOWS Account #2 was also used to pay expenses associated with the production of "The Wolf of Wall Street."  Collectively, these two accounts are referred to herein as the "TWOWS Accounts."  (Id. ¶ 391.)

The TWOWS Accounts, in which funds traceable to the Good Star Account were deposited, were used to pay for production expenses including, but not limited to, the following:  (i) between April 2013 and February 2014, 17 payments totaling approximately $3.9 million were made to Sikelia Productions, Inc., a production company belonging to the film's director; (ii) between May 2012 and April 2014, at least $48 million was paid to a company that specializes in managing payroll and production expenses for the film industry; (iii) between July 2012 and May 2014, at least $4.1 million was paid to various visual effects companies; (iv) between May 2012 and April 2014, approximately $2.5 million was paid to the Screen Actors Guild; and (v) approximately $80,000 was paid to a yacht charter company.  (Id. ¶ 392.)

LOW, who distributed more than $10 million to Red Granite Pictures from the Good Star Account, received a "special thanks" full-screen credit in the closing credits of "The Wolf of Wall Street."  (Id. ¶ 393.)

In his acceptance speech upon winning a Golden Globe for his role in "The Wolf of Wall Street," the recipient of the award thanked "the entire production team," singling out in particular "Joey, Riz, and Jho," whom he characterized as "collaborators" on the film.  Upon information and belief, this reference was to Joey McFarland, a co-founder of Red Granite Pictures, AZIZ, and LOW.  (Id. ¶ 394.)

During at least part of the time during which the above-referenced transfers were made, LOW maintained a Red Granite Pictures email account with the domain name @redgranitepictures.com.  This email account was deleted in or around April 2012.  (Id. ¶ 395.)

**B.      Tens of Millions in 1MDB Funds Funneled Through the Aabar-BVI Account Were Used to Fund Red Granite Pictures and "The Wolf of Wall Street."**

Red Granite Pictures, and its production of "The Wolf of Wall Street" in particular, were also funded with money traceable to the proceeds of the 2012 bond sales that were diverted through the Aabar-BVI Swiss Account.  (Id. ¶ 396.)

Between June 18, 2012, and November 14, 2012, $238,000,000 in funds traceable to the diverted proceeds of the 2012 1MDB bond sales was transferred from Aabar-BVI to AZIZ's Red Granite Capital Account at BSI Bank in Singapore.  (Id. ¶ 397.)

Between on or about June 20, 2012 – roughly two days after Aabar-BVI sent its first wire to Red Granite Capital – and November 20, 2012, eleven wires totaling $64,000,000 were sent from AZIZ's Red Granite Capital Account in Singapore to the RGP Operating Account in the United States.  (Id. ¶ 398.)

Shortly after each of these eleven wires, Red Granite Pictures transferred funds from its Operating Account to the RGP Pictures Account.  Between on or about June 26, 2012 and November 20, 2012, a total of $54,797,321 was transferred from the RGP

Operating Account to the RGP Pictures Account.  (Id. ¶ 399.)

In a series of nine transfers between approximately June 27, 2012, and November 23, 2012, $52,004,162 of this $54,797,321 was then transferred from the RGP Pictures Account to the TWOWS Account #1, which, as noted above, belonged to the SPV responsible for producing "The Wolf of Wall Street."  (Id. ¶ 400.)

The movement of funds from the Red Granite Capital Account in Singapore through various accounts associated with Red Granite Pictures to the TWOWS Account #1 occurred in very close succession.  For example, in one series of transfers all occurring on or about August 10, 2012: (i) $3,000,000 was sent from the Red Granite Capital Account to the RGP Operating Account; (ii) $2,831,754 was sent from the Red Granite Operating Account to the RGP Pictures Account; and (iii) $2,831,754 was sent from the RGP Pictures Account to the TWOWS #1 Account.  (Id. ¶ 401.)

## IV.   THIS COURT SHOULD ORDER THE RESTRAINT OF THE RESTRAINED PROPERTY.

Title 18 U.S.C. § 983(j)(1)(A) authorizes the United States to seek, and the Court to issue, an ex parte restraining order over all assets that are designated in a civil forfeiture complaint as forfeitable to the United States.  The statute provides:

(1) Upon application of the United States, the court may enter a restraining order or injunction, require the execution of satisfactory performance bonds, create receiverships, appoint conservators, custodians, appraisers, accountants, or trustees, or take any other action to seize, secure, maintain, or preserve the availability of property subject to civil forfeiture—

(A) upon the filing of a civil forfeiture complaint alleging that the property with respect to which the order is sought is subject to civil forfeiture...

18 U.S.C. § 983(j)(1)(A).

The text of Section 983(j)(1)(A) provides that a restraining order may be entered ex parte upon the filing of a complaint, and includes no requirement of pre-restraint notice or a hearing when a civil forfeiture complaint has already been filed.  Section 983

(j)(1)(A) diverges from the statutory provision governing an application for a restraining order made prior to the filing of a complaint, 18 U.S.C. § 983(j)(1)(B), which provides for "notice to persons appearing to have an interest in the property and opportunity for a hearing" before a restraining order can issue. Section (j)(1)(A), which governs applications made post-complaint, contains no such language. See United States v. Melrose E. Subdivision, 357 F. 3d 493, 499 (5th Cir. 2004) (noting relevance of absence of any mention of a pre-restraint hearing before issuance of post-complaint restraining order under 18 U.S.C. § 983(j)(1)(A)). In this way, Sections (j)(1)(A) and (j)(1)(B) mirror the provisions governing restraining orders in criminal cases, which require notice and a hearing when the Government seeks a restraining order before, but not after, obtaining an indictment. See 21 U.S.C. §§ 853(e)(1)(A) (post-indictment) and 853(e)(1)(B) (pre-indictment).

Here, a restraining order should properly issue because a Complaint has been filed alleging that the WOLF OF WALL STREET RIGHTS are subject to forfeiture to the United States.[5] As alleged in the Complaint, the WOLF OF WALL STREET RIGHTS are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in one or more money-laundering transactions in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(2)(B), 1956(h) and 1957, or because they are traceable to such property. The WOLF OF WALL STREET RIGHTS are further subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) because they constitute or are derived from the proceeds of a "specified unlawful activity," or a conspiracy to commit a specified unlawful activity.

"Specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7)(A) and (c)(7)(B)(iv), includes foreign offenses involving the misappropriation of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); fraud by or

---

[5] The text of 18 U.S.C. § 983(j)(1)(A) does not require any further showing before a restraining order may issue. In the context of an application for an order restraining property made pursuant to 21 U.S.C. § 853(e) in a criminal case, the Supreme Court has held that a probable cause standard applies. United States v. Monsanto, 491 U.S. 600, 615-616 (1989). Here, the facts alleged in the Complaint (an summarized above) are more than sufficient to establish probable cause to believe that the WOLF OF WALL STREET RIGHTS are forfeitable to the United States.

against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), receipt of stolen money (18 U.S.C. § 2315); wire fraud (18 U.S.C. § 1343); and conspiracy to commit such offenses.

By this application, the United States requests that the Court order that Red Granite Pictures be restrained from dissipating the Restrained Property, and that the United States Marshals Service be granted oversight over the Restrained Property and all financial accounts associated with it.  Such a restraint is consistent with federal forfeiture law and the Court's equitable powers.[6]

## V. THE UNITED STATES IS ENTITLED TO <u>EX PARTE</u> ISSUANCE OF A RESTRAINING ORDER WITHOUT PRIOR NOTICE AND OPPORTUNITY FOR HEARING.

In the present action, the Government seeks to preserve the availability of the WOLF OF WALL STREET RIGHTS that the Complaint alleges are subject to forfeiture.  The requested restraining order is the only means of ensuring that the assets will be available for forfeiture as sought by the Complaint.  For these reasons, the immediate restraint of the assets upon the ex parte application of the United States is in the public interest.

Failure to restrain, preserve, and properly account for the Restrained Property will likely result in its irrevocable loss and will render it unavailable for forfeiture.  Without a restraining order, Red Granite Pictures, LOW, AZIZ, or other related entities could dissipate the Restrained Property, leaving those assets unavailable for forfeiture.  The Government seeks a restraining order that will permit Red Granite Pictures or the current manager or owner of "The Wolf of Wall Street" to continue to distribute and sell the motion picture and maintain business as usual, rather than a more intrusive remedy, such as a seizure.

---

[6] For example, the procedural rules governing <u>in rem</u> forfeiture proceedings recognize a court's power to restrict the use (as well as the sale or disposition) of property subject to forfeiture.  <u>See</u> Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Rule G(7)(a).

## VI.    EXTENT OF RESTRAINING ORDER

For the foregoing reasons, the Government requests that this Court enter a restraining order, on an ex parte basis, immediately restraining the Restrained Property. The proposed restraining order provides as follows:

a.    The USMS shall be hereby appointed the Monitor of the Restrained Property, and all accounts associated with same.  The USMS may name a designee and/or monitor to conduct and perform the services identified herein and for the purpose of reporting to the Court during the term of this Order.

b.    Red Granite Pictures, LOW, AZIZ, their attorneys, agents, and family members, and anyone acting on their behalf, and all persons or entities acting in concert or participation with any of the above, and all persons and entities having actual knowledge of the order shall not directly or indirectly, transfer, sell, assign, pledge, distribute, hypothecate, encumber, attach or dispose of in any manner; cause to be transferred, sold, assigned, pledged, distributed, hypothecated, encumbered, attached or disposed of in any manner; or take, or cause to be taken, any action that would have the effect of depreciating, damaging, or in any way diminishing the value of the Restrained Property, including any action that would increase costs or reduce revenues.

c.    The owners of the Restrained Property, including Red Granite Pictures, LOW, and AZIZ, shall be required to maintain the present contracts and agreements related to the WOLF OF WALL STREET RIGHTS, and ensure timely payment on the same, and adhere to all provisions of any applicable contract or agreement, until further order of this Court; and shall allow the United States to join in and direct key business decisions about day to day operations and to monitor compliance with the Order by all lawful means available.

d.    Red Granite Pictures, LOW, and AZIZ shall not make any effort to interfere with the collection or preservation of the Restrained Property.

e.    Except as otherwise provided in the Order, all persons, financial institutions, and other entities who have or assert any access to, interest in, control over,

16

or legal claim to the Restrained Property, and all such persons' or entities' agents, servants, employees, attorneys, family members, and those persons in active concert or participation with them, including but not limited to Red Granite Pictures, LOW, or AZIZ, shall be restrained, prohibited, and enjoined from attempting or taking any action that could affect the availability, marketability, or value of the Restrained Property, including but not limited to, selling, conveying, transferring, bailing, assigning, pledging, collateralizing, hypothecating, encumbering, wasting, secreting, damaging, diminishing the value of, disposing of, or removing from the jurisdiction of this Court, all or any part of their interest, direct or indirect, in the Restrained Property.

<u>With respect to financial institutions:</u>

f.    Any and all financial institution holding any of the Restrained Property or which relate to the collection of the Restrained Property, shall be enjoined, ordered, and directed to:

i.    upon written request by the USMS, alter the signature cards to issue signature authority in the names of persons designated by the USMS, and provide the USMS with access to online banking;

ii.    take all reasonable and necessary steps to ensure that all financial activity and information flow regarding the Restrained Property be conducted only by the USMS or the USMS monitor designated by the USMS.  No financial activity or any sort may be conducted by or at the direction of any party other than the USMS or the monitor designated by the USMS;

iii.    take no offset against any account, but continue to allow debits and withdrawals from the account unless otherwise directed in writing by the USMS;

iv.    continue to credit any deposits, interest, dividends, capital gains distributions, or other credits to any such account in the normal course of business, provided that any such deposits, interest, dividends, capital gains distributions, or other credits are subject to this Order;

1            v.       upon receiving notice of the Order, promptly inform the USMS

2    as to the account balances at the time of notice, and thereafter promptly respond to

3    requests from the USMS for updated information about the accounts' status, balances,

4    and activity; and

5            vi.      not receive directions, conduct transactions, or provide any

6    financial information related to the management of the Restrained Property or the

7    collection of the Restrained Property, to Red Granite Pictures, LOW, or AZIZ, their

8    employees, agents, and family members, or any and all persons otherwise associated with

9    or employed by Red Granite Pictures, LOW, or AZIZ.

10           <u>With respect to the business operations:</u>

11          g.    Red Granite Pictures and/or any designee of the USMS shall:

12          i.     Immediately identify all relevant accounts – Red Granite

13   Pictures shall immediately identify to the USMS any and all accounts being utilized with

14   respect to the management of the Restrained Property or for the collection or

15   disbursement of the Restrained Property, and which individuals and entities have access

16   to or control over those accounts.  Red Granite Pictures shall not open new accounts or

17   change or close existing accounts related to or holding the Restrained Property or for the

18   collection or disbursement of the Restrained Property without the express approval or at

19   the direction of the USMS.

20          ii.     Maintain customer service, privacy, and security -- Red

21   Granite Pictures shall maintain its existing service, privacy, and security protections to all

22   customers and the general public in compliance with all existing contracts, policies, and

23   practices, and shall not reduce the quality or frequency of same to any customer or the

24   general public, unless and until further ordered by the Court, or unless or until approved

25   by the USMS, their designee, or an appointed monitor.

26          iii.    Operate lawfully and prudently -- Red Granite Pictures shall

27   operate in compliance with all applicable federal, state, and local laws and regulations,

28

1  carry out all managerial, collection, and other obligations pursuant to agreement or

2  contract, and maintain customary practices applicable within the level of the industry.

3             iv.     Follow Generally Accepted Accounting Principles ("GAAP")

4  in accounting, and preserve records – Red Granite Pictures shall conduct and record its

5  transactions, bookkeeping, and accounting in accordance with GAAP, and shall not

6  discard or destroy any business records during the pendency of the Order, unless or until

7  further ordered by the Court, or unless or until approved by the USMS, its designee, or an

8  appointed monitor.

9             v.     Discretion to review and require pre-approval of every

10  transaction -- the USMS, its designees, and/or an appointed monitor shall have authority

11  to require that the conducting of any transaction, and the incurring of any obligations,

12  occur only with the written approval of the USMS/monitor, which approval shall be given

13  if the transaction is found to be necessary in the ordinary course of business.  The

14  USMS/monitor shall have the authority to pre-approve, in writing, designated categories

15  of transactions to occur or obligations to incur, where the USMS/monitor determines that

16  such categorical pre-approval is necessary for the effective operation of the business; but

17  the USMS/monitor shall also have authority to examine all records and information

18  concerning such transactions/obligations, and to revoke or revise such categorical

19  authorization at any time.  In no event shall USMS be obligated, liable or required to pay

20  funds from any other source than the accounts or assets of Red Granite.

21             vi.     No other transactions and retention of the Restrained Property

22  – Red Granite Pictures is prohibited from conducting any transaction or incurring any

23  obligation with respect to the Restrained Property except if done in compliance with

24  subsection (d) above.  Unless directed by the USMS, Red Granite Pictures shall continue

25  to collect the Restrained Property in the existing accounts utilized for that purpose, and

26  subject to transactions approved in accordance with subsection (d) above, shall retain the

27  Restrained Property in those accounts until otherwise instructed by the Court or the

28  USMS.  In its discretion, the USMS may direct that the monthly net proceeds of the

Restrained Property, after approval and necessary expenditures have been accounted for, be paid into an escrow or an official U.S. government account pending resolution of this case.

vii.    "Conducting a transaction" or "incurring an obligation" defined – "Conducting a transaction" and "incurring an obligation" includes, but is not limited to, withdrawing, depositing, or transferring any of the Restrained Property, whether in cash or by check, ATM, electronic, ACH, ETF, or wire transfer; writing any check or causing any kind of check to be issued; purchasing or leasing any good, vehicle, equipment, inventory service, or any other business in whole or in part paying any wage, bonus, benefit, or other form of payment, remuneration, or distribution to any owner or employee of Red Granite Pictures, LOW, AZIZ, or any other person or entity without express permission of the USMS.

<u>United States Marshals Service's entry and access to conduct business review and appraisal:</u>

h.    The USMS and/or its designees are forthwith authorized to make entry into any part of the Red Granite Pictures' business premises during business hours to conduct both a thorough review of the business operations related to the Restrained Property and to complete an inspection, inventory, and appraisal of the condition and value of the Restrained Property.  The USMS may be accompanied by one or more appraisers and/or federal agents and/or government and contract personnel selected by the USMS to assist them.  In conducting the review and appraisal, the USMS shall have the following authority:

i.    Observe business operations -- to enter all premises and offices during business hours, to observe all aspects of Red Granite Pictures' operations related to the Restrained Property, including but not limited to:  the daily accounting, recording, depositing, and processing of cash and other receipts; payments of salaries, bills, and other business obligations; communications with and solicitations of customers and potential customers; hiring, firing, and supervision of employees; use, maintenance, and

handling of equipment; business activity occurring away from the office and business premises, including any indirect service provider.

     ii. Review and copy documents and data -- to review, inspect, and copy all documents and data relating to the Restrained Property, including but not limited to: all books and records and data, whether in hard copy format, microfiche, or magnetic, floppy-disc, ZIP drive, hard drive, local or remote server, or any other computer-storage medium whether or not such data storage is password protected; the contents of all correspondence on file; the contents of all incoming mail at all mail-receipt locations; all employee records including personnel files, and payroll, benefit, pension, and retirement account records; all customer data, including lists, contracts, and locations, billing, accounts, and accounts receivable; all bank and financial records; all security, alarm, and surveillance systems; and all records of loans, debts, mortgages, liens, or other security interests, whether issued by or held upon Red Granite Pictures, or held upon any equipment, inventory, vehicle, account, account receivable or other thing of value.

     iii. Interview owners, managers, employees, contractors, vendors and consultants -- to interview owners, managers, employees, contractors, vendors and independent contractors of Red Granite Pictures with respect to business operations.  This authority shall supersede any state law privilege that may exist between the subject parties.

     iv. Memorandum of Understanding -- after assessment by the USMS, a manager may be appointed for the Restrained Property.  The manager shall enter into a Memorandum of Understanding ("MOU") with the USMS that details specific duties and obligations.  Nothing in this Restraining Order or the MOU shall provide any legal, right, title or interest in the property.  The USMS has the right to remove and replace this manager for any reason, including, but not limited to, a violation of the MOU or this Restraining Order.

## VII. CONCLUSION

   Wherefore, the United States respectfully requests that the Court grant this <u>ex</u>

parte application and Order for the restraint of the Restrained Property as requested in the proposed order submitted concurrently herewith.

DATED: July 20, 2016                    Respectfully submitted,

                                        M. KENDALL DAY
                                        Chief, AFMLS

                                        EILEEN M. DECKER
                                        United States Attorney


                                        _____/s/_____
                                        JOHN J. KUCERA
                                        CHRISTEN A. SPROULE
                                        Assistant United States Attorneys

                                        WOO S. LEE
                                        Deputy Chief, AFMLS
                                        KYLE R. FREENY
                                        Trial Attorney, AFMLS

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA