1

2

3                                                           JS-6

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                 FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

UNITED STATES OF AMERICA,              NO. CV 16-5362-DSF (PLAx) *
11                                         NO. CV 17-4439-DSF (PLAx)
            Plaintiff,
12
                 v.
13                                         **CONSENT JUDGMENT OF FORFEITURE**
"THE WOLF OF WALL STREET" MOTION
14 PICTURE, ETC.,

15          Defendant.

16 ─────────────────────────────

17 UNITED STATES OF AMERICA,

18          Plaintiff,

19               v.

20 "DADDY'S HOME" AND "DUMB AND
DUMBER TO" MOTION PICTURES,
21 ETC.,

22          Defendants.

23

24     On July 20, 2016, Plaintiff United States of America

25 ("Plaintiff," the "United States," or the "Government") commenced

26 case number CV 16-5362-DSF (PLAx), and notice was given and published

27 in accordance with law.  On August 4, 2017, the Government filed a

28 first amended complaint, and notice was given in accordance with law.

On September 9, 2016, Claimants Red Granite Pictures, Inc.; Red
Granite Capital, Ltd.; Red Granite Capital US, LLC; TWOWS, LLC; and
Red Granite International, Inc. (collectively, the "Red Granite
Claimants") filed claims to the original Complaint as to the
defendant asset any and all rights, presently-held and future, for
the motion picture "The Wolf of Wall Street" belonging to Red Granite
Pictures, Inc. ("Red Granite Pictures"), a film production company
located in Los Angeles, California, including copyright and
intellectual property rights, as well as the right to collect and
receive any revenue or receipts (whether gross or net), royalties,
and/or other proceeds resulting from the ownership by or interest of
Red Granite Pictures in connection with the role of Red Granite
Pictures in producing, distributing, or otherwise financing or
promoting the motion picture "The Wolf of Wall Street," as well as
any and all monies received or held by Red Granite Pictures, whether
as cash or held in any account in any financial institution, that
constitutes any and all proceeds, to include but not limited to any
revenue or receipts (whether gross or net), royalties, and/or other
proceeds resulting from the ownership by or interest of Red Granite
Pictures, whether in whole or part, in connection with the role of
Red Granite Pictures in producing, distributing, or otherwise
financing or promoting the motion picture "The Wolf of Wall Street,"
or related to or derived from same (hereinafter "TWOWS," as more
specifically described in Attachment A to the original Complaint in
case number CV 16-5362-DSF (PLAx)).  On October 7, 2016, Claimants
Directors Guild of America, Inc., Screen Actors Guild-American
Federation of Television and Radio Artists, Writers Guild of America
West, Inc., and Motion Picture Industry Pension and Health Plans

(collectively, the "Union Entities," and with the Red Granite Claimants, the "Claimants") filed claims to the original Complaint as to TWOWS.  No other claims or answers have been filed, and the time for filing such claims and answers has expired.  All Claimants would have filed claims to the First Amended Complaint in case number CV 16-5362-DSF (PLAx) if a settlement had not been reached.

On June 15, 2017, Plaintiff commenced case number CV 17-4439-DSF (PLAx), and notice was given and published in accordance with law. Red Granite Pictures, Inc.; Red Granite Capital US, LLC; Red Granite Capital, Ltd.; Red Granite International, Inc.; Red Granite Entertainment Holdings, LLC; DDTo Finance, LLC; Dumb and Dumber To, LLC; RGDD2 Productions, LLC; Daddy's Home LLC; the Union Entities; and Paramount Pictures Corporation (collectively, the "Potential Claimants") informed the Government that they had potential claims to the defendant assets any and all rights, presently-held and future, for the motion pictures "Daddy's Home" and "Dumb and Dumber To" belonging to Red Granite Pictures, including copyright and intellectual property rights, as well as the right to collect and receive any revenue or receipts (whether gross or net), royalties, and/or other proceeds resulting from the ownership by or interest of Red Granite Pictures in connection with the role of Red Granite Pictures in producing, distributing, or otherwise financing or promoting the motion pictures "Daddy's Home" and "Dumb and Dumber To," as well as any and all monies received or held by Red Granite Pictures, whether as cash or held in any account in any financial institution, that constitutes any and all proceeds, to include but not limited to any revenue or receipts (whether gross or net), royalties, and/or other proceeds resulting from the ownership by or

3

interest of Red Granite Pictures, whether in whole or part, in connection with the role of Red Granite Pictures in producing, distributing, or otherwise financing or promoting the motion pictures "Daddy's Home" and "Dumb and Dumber To," or related to or derived from same (hereinafter "DH/DDTO," as more specifically described in Attachment A to the original Complaint in case number CV 17-4439-DSF (PLAx), and together with TWOWS, the "Defendant Assets"). No other claims or answers have been filed, and the time for filing such claims and answers has expired. All Potential Claimants would have filed claims to the Complaint in case number CV 17-4439-DSF (PLAx) if a settlement had not been reached.

Now, the parties have reached an agreement that is dispositive of the claims and potential claims to the Defendant Assets in case numbers 16-cv-5362-DSF (PLAx) and 17-cv-04439-DSF (PLAx) (the "Actions"). Based on the parties' Stipulation and Request for a Consent Judgment (the "Agreement," a copy of which is annexed hereto as Exhibit A), and for good cause shown, IT IS ORDERED, ADJUDGED AND DECREED;

A.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

B.   The operative Verified Complaints for Forfeiture In Rem in the Actions (the "Complaints") assert claims pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C).

C.   Notice of the Actions has been given in accordance with law. All potential claimants to the Defendant Assets other than Claimants and Potential Claimants are deemed to have admitted the allegations of the Complaints with respect to the Defendant Assets.

D.   For purposes of this Consent Judgment, the term "Red Granite" is defined to include, collectively and individually:  Red Granite Pictures, Inc.; Red Granite International, Inc.; Red Granite Capital Ltd.; Red Granite Partners, Inc.; Red Granite Capital US, LLC; Red Granite Music, LLC; Red Granite Investment Holdings, LLC; Red Granite Real Estate Holdings, LLC; Red Granite Entertainment Holdings, LLC; Red Granite Entertainment, Inc.; RG Productions Development, LLC; DDTo Finance, LLC; RGDD2 Productions, LLC; Dumb and Dumber To, LLC; TWOWS, LLC; The Papillon Project, LLC; Papillon Movie LLC; Papillon Movie Finance LLC; Daddy's Home, LLC; Daddy's Home Finance, LLC; OOTF, LLC; The Horns Project, Inc.; Victory or Death, LLC; The Horns Project Productions Ltd.; Blue Box International LLC; and Metropolis IX Capital Advisors, LLC, as well each of their predecessors, successors, assigns, subsidiaries, parent companies, and affiliated entities.

E.   Nothing in this Consent Judgment or the Agreement constitutes an admission of wrongdoing or liability on the part of Red Granite, its Shareholders (as defined below), or the Union Entities, nor can this Consent Judgment or the Agreement be admissible against Red Granite, its Shareholders, or the Union Entities in any proceeding as evidence of any of the allegations set out in the operative complaints in the Actions.

Forfeiture Amount

1.   Red Granite shall:

a.   Pay the amount of $60,000,000.00 as substitute *res* for the Defendant Assets (the "Forfeiture Amount") in a manner consistent with the terms of the Agreement, and agrees to forfeit to the Government all rights, title, and interest in the Forfeiture Amount.

1        b.   In connection with any and all funds Red Granite

2  intends to provide to satisfy any portion of the Forfeiture Amount,

3  Red Granite shall identify the source of those funds and provide to

4  the Government sufficient information to satisfy the Government as to

5  the legitimacy of any and all sources of such funds, other than funds

6  already in the possession of or held for the benefit of Red Granite

7  (*e.g.*, the "Paramount Funds," as defined below).

8        c.   Within ten [10] business days from the Court's entry

9  of the consent judgment, Paramount Pictures Corporation ("Paramount")

10  shall transfer to the Government, or cause to be transferred to the

11  Government, all funds in Paramount's possession or control on that

12  date that, as shown on the most recent participation statement issued

13  by Paramount, are due from Paramount to Red Granite Capital US, LLC

14  from the motion picture "Daddy's Home" (the "Paramount Funds").  The

15  Government shall hold the Paramount Funds in an interest-bearing

16  account, subject to paragraph 8(d)(i) of the Agreement.

17        d.   Pursuant to paragraphs 39 and 42(c) of the Agreement,

18  Paramount shall pay directly to Red Granite Capital US, LLC, Red

19  Granite Pictures, Inc., or their assign, any funds that, as shown on

20  the quarterly or annual (as applicable) statements issued by

21  Paramount after the date of the transfer to the Government prescribed

22  in paragraph 8(c) of the Agreement, become due from Paramount to Red

23  Granite from the motion picture "Daddy's Home".  Red Granite shall

24  hold, and not expend nor disburse, such funds, including as

25  Collateral (as that term is defined in paragraph 17 of the

26  Agreement), until such time as either (a) Red Granite satisfies the

27  entire Forfeiture Amount, or (b) the Government consents in writing

28  to Red Granite's use of such funds.

1          e.    The Forfeiture Amount shall be payable as follows:

2               i.    "First Payment":  No later than 30 days after the

3    consent judgment is entered by the Court, subject to Paramount's

4    timely compliance with the requirements of Paragraph 8(c) of the

5    Agreement, Red Granite shall be deemed to have paid the Government an

6    amount equal to $30 million (or more, at Red Granite's sole election)

7    from the Paramount Funds, which the Government may thereafter

8    transfer as it deems appropriate;

9               ii.    "Second Payment":  No later than 180 days after

10   the Government receives the payment of the $30 million described in

11   the "First Payment," Red Granite shall pay to the United States an

12   additional $20 million.  In the event that Red Granite has chosen to

13   pre-pay any portion of the Forfeiture Amount as of the date that the

14   Second Payment is due, the Second Payment shall be in an amount such

15   that Red Granite has paid the Government a total of at least $50

16   million, plus applicable interest as set forth below; and

17              iii.    "Third Payment":  No later than 180 days after

18   the Government receives the "Second Payment," Red Granite shall pay

19   to the United States an amount no less than $10 million.  In the

20   event that Red Granite has chosen to pre-pay any portion of the

21   Forfeiture Amount as of the date that the Third Payment is due, the

22   Third Payment shall be in an amount such that Red Granite has paid

23   the Government a total of $60 million, plus applicable interest as

24   set forth below (*i.e.*, the entire Forfeiture Amount);

25              iv.    From the date of the Court's entry of the consent

26   judgment, Red Granite shall pay the Government 2% interest per annum

27   on any unpaid portion of the Forfeiture Amount, which shall be

28   payable in addition to and at the same time as the payment schedules

in (i) – (iii) above.  Thirty [30] days prior to the date that each of the Second Payment and the Third Payment is due, the Government and Red Granite shall calculate the amount of interest due and confirm in writing the total amount due and owing for such payment.

v.   For the avoidance of doubt, Red Granite may prepay any portion of the Forfeiture Amount without accruing interest thereon or incurring any other prepayment penalty.

2.   Should Red Granite not make full payments in accordance with the terms of the Agreement, the Government may declare an event of default.  Should the Government declare such a default, it shall provide written notice to Red Granite, with a copy to the Union Entities, and allow Red Granite seven [7] business days to cure any such default.  Following this seven-day period, should Red Granite not fully cure the default, the Government may immediately accelerate the payment schedule for the entire remainder of the Forfeiture Amount not then paid.

3.   Immediately following the First Payment (*i.e.*, the $30 million payment to the Government from the Paramount Funds), the Government shall cause $3 million to be paid from the Paramount Funds to Red Granite, to an account designated in writing by counsel to Red Granite.  In the Agreement, the amount of the Paramount Funds that remains on deposit with the Government after (i) the First Payment has been made to the Government and (ii) the initial $3 million has been distributed directly to Red Granite, is known as the "Remainder Funds."

4.   The Government and Red Granite intend that the $3 million from the Paramount Funds that is paid directly to Red Granite pursuant to the preceding Paragraph is an amount roughly sufficient

to cover Red Granite's normal operating expenses and disclosed obligations through the date that the Second Payment is due. Notwithstanding Red Granite's best efforts to project that $3 million will be an amount sufficient to cover Red Granite's normal operating expenses and disclosed obligations until the Second Payment is due, within ten [10] business days upon written application by Red Granite to a "Control Group" that the Government has specifically identified and made known to Red Granite, the Government shall release to Red Granite such portion of the Remainder Funds as are necessary to pay for obligations incurred by Red Granite prior to the date of this Agreement, and which have been disclosed to the Government.

5. Thirty [30] days prior to the due date of the Second Payment, Red Granite may provide to the Government a schedule of normal operating expenses and disclosed obligations that Red Granite has undertaken to pay during the 180 day period following the Second Payment, which the Government shall release as set forth in Paragraph 11 of the Agreement, *i.e.*, within ten [10] business days upon written application by Red Granite to the "Control Group," the Government shall release to Red Granite such portion of the Remainder Funds as are necessary to pay for Red Granite's scheduled normal operating expenses and disclosed obligations over the 180 days period following the due date of the Second Payment. Notwithstanding the foregoing, however, the Government shall have no obligation to release additional Remainder Funds to Red Granite under this paragraph if (a) Red Granite determines to raise funds to make the Second Payment by selling or entering into a new borrowing agreement secured by the Defendant Assets (a "Covered Transaction"), *and* (b) by the due date of the Second Payment, Red Granite is unable to enter into a Covered

Transaction, *and* (c) Red Granite has not otherwise made the Second Payment.  If a Covered Transaction is scheduled to close, but has not yet closed, at the time that the Second Payment is due (and Red Granite has not otherwise made the Second Payment), the Government shall release to Red Granite such portion of the Remainder Funds as are necessary to pay for ordinary course obligations through two weeks following the date of the scheduled closing of such Covered Transaction.  For purposes of this Agreement, Red Granite shall be deemed unable to enter into a Covered Transaction if it has contacted (or affirmatively declined to contact) customary lenders and buyers in the market for motion picture assets or revenue streams, as well as non-traditional buyers in the capital markets (such as hedge funds or private equity funds), none of which has made a firm commitment to enter into a Covered Transaction.

6.    In addition, within ten [10] business days upon written application by Red Granite, the Government may release to Red Granite such portion of the Remainder Funds as are necessary to pay for other ordinary course expenses or to fund transactions outside of Red Granite's ordinary course, as defined below.  The Government's consent to release such funds may not be unreasonably withheld.  To the extent that there is a disagreement about whether any such expense is appropriate, Red Granite and the Government shall meet and confer, and any disputes shall be brought to the Court for decision. Red Granite shall be responsible for the reasonable costs of any professional services that the Government, in its sole discretion, believes necessary for it to make a reasonably informed decision concerning the release of Remainder Funds for any proposed non-ordinary course transaction.

7.    For the avoidance of doubt, non-ordinary course transactions within the meaning of the previous paragraph include, but are not limited to the following:

a.    Sale or transfer of ownership interest in any Red Granite entity or affiliate, except as set forth in Paragraphs 17-22 of the Agreement.

b.    Payment of dividends or distributions to shareholders other than salaries, *provided, however*, that Riza Aziz (the "Majority Shareholder") shall continue to draw no salary (other than the minimum required in order to ensure continuity of health insurance coverage under Red Granite's plan) until the Forfeiture Amount has been paid in full, as he has done voluntarily during the pendency of these Actions.

c.    Issuance or repurchase of equity shares, except as set forth in Paragraphs 17-22 of the Agreement.

d.    Entering into new loan facilities, except as set forth in Paragraphs 17-22 of the Agreement.

e.    Acquiring capital assets of a value greater than $50,000.00.

f.    Selling or otherwise disposing of assets, except as set forth in Paragraphs 17-22 of the Agreement.

8.    At any time, and upon Red Granite's written notice to the Government, Red Granite may apply all or part of the Remainder Funds towards partial or full satisfaction of the Forfeiture Amount.

9.    Following payment in full of the Forfeiture Amount, the Government shall release to Red Granite that portion of the Remainder Funds (and any interest earned thereon) not already distributed to Red Granite or paid to the Government.

Security Interest

10.   To secure the Forfeiture Amount, Red Granite shall grant to the United States a General Business Security Interest and a pledge of all copyrights and other after-acquired property, subordinated only to existing valid, perfected security interests (the "Collateral"), *provided*, *however*, that the Collateral shall not include Red Granite's development assets, as identified to the Government (the "Excluded Development Assets"), *provided further*, *however*, that the Collateral shall include Red Granite's rights to proceeds, in any form, from the Excluded Development Assets.  The Government and Red Granite shall insure that the security interest granted to the United States under this Paragraph is consistent with Red Granite's existing contractual obligations, including, but not limited to, and in furtherance of Paragraph 33 of the Agreement, customary Union Entity lien priority and inter-creditor arrangements in connection with motion pictures produced or distributed by Red Granite that are produced subject to Union Entity contracts, including motion pictures derived from Excluded Development Assets.

11.   Notwithstanding anything in this Consent Judgment or the Agreement to the contrary, Red Granite may, in its sole discretion, sell or borrow against the Collateral (in whole or in part) under the following circumstances:

      a.   All proceeds from any such sale or borrowing shall be paid to the Government in satisfaction of the Forfeiture Amount, except

      b.   If and only if Red Granite has paid the first two installments of the Forfeiture Amount (*i.e.*, a total of $50 million), Red Granite may retain the proceeds

of any such sale or borrowing in amount of no more than $5 million, to be used exclusively for development and overhead.  Any additional proceeds of such sale or borrowing shall be paid to the Government in satisfaction of the Forfeiture Amount, regardless of whether such monies are due and owing under this Agreement yet.

c.    In the event that Red Granite retains any funds from a sale of or borrowing against the Collateral pursuant to paragraph 18(b) of the Agreement, Red Granite shall grant to the United States an additional security interest in Red Granite's rights to the proceeds from any development asset financed with such funds.

12.  Upon written consent of both the Government and Red Granite, other assets may be substituted for some or all of the Collateral.

13.  The entirety of the Agreement shall be with recourse to the Majority Shareholder in his personal capacity, and the Majority Shareholder shall personally guarantee Red Granite's payment obligations (described in Paragraphs 8-16 of the Agreement) and the Majority Shareholder shall pledge all of his assets in whatever form held, of any type, and wherever located (the "Majority Shareholder Assets"), to the full satisfaction of Red Granite's obligation to pay the Forfeiture Amount.

14.  Red Granite and the Majority Shareholder shall execute such documentation as may be reasonably necessary in order to effectuate and perfect the security interests and pledge of the Majority Shareholder Assets.

15.   For the avoidance of doubt, and notwithstanding anything to the contrary in this Consent Judgment or the Agreement, nothing in this Consent Judgment or the Agreement shall entitle the Government to any amount of money greater than the Forfeiture Amount (plus all applicable interest).

Release of Property

16.   In consideration for the payment of the Forfeiture Amount, the United States agrees to abandon its claims to forfeit the Defendant Assets.

Surrender of Rights

17.   Upon full payment to the Government of the Forfeiture Amount, any and all potential claimants who had standing to file claims against the Defendant Assets but did not, including secured creditors such as Aabar Investments PJS Limited, shall be deemed to have surrendered all rights, title, and interest in the Defendant Assets.   For the avoidance of doubt, neither the Union Entities nor Paramount have surrendered any right, title, or interest they may have in the Defendant Assets, if any.

No Interference

18.   Red Granite shall not file, or cause any other person or entity to file, or assist any other person or entity in filing, any claim to the Forfeiture Amount or the Defendant Assets, or in any way interfere with or delay the forfeiture of the Forfeiture Amount.

19.   Upon request of the Government, Red Granite shall reasonably cooperate with the Government in connection with responding to any claims asserted against the Forfeiture Amount or the Defendant Assets. Nothing in this paragraph shall require Red Granite to waive attorney-client privilege, the work product

doctrine, or any other privilege, immunity, or statutory or constitutional right or protection.

No Admission of Liability/No Tax Refund

20.   This Consent Judgment and the Agreement do not constitute an admission of liability or fault on the part of Red Granite.

21.   Notwithstanding any other provision of this Consent Judgment or the Agreement, the payment of the Forfeiture Amount does not constitute a fine, penalty, or punitive damages, *provided, however*, that the Forfeiture Amount shall be forfeited in its entirety to the Government, and shall not be claimed as a deduction or write-off for tax purposes.

Release of Civil Claims

22.   The Government and Red Granite hereby fully and finally compromise, settle, release, and dispose of the following (collectively, the "Settled Claims"):

> a.   Any and all civil claims, including under the asset forfeiture or money laundering statutes, that the Government has asserted or could assert in connection with alleged violations arising out of the specified unlawful activity alleged in the Complaints, or any other offenses arising from or related to the events and acts described in the Complaints, including any offenses having to do with 1MDB in any way (the "Covered Conduct"), against any of the following people, entities, or property:
>
> > i.   Red Granite, as defined above.
> >
> > ii.   Red Granite's officers, directors, employees, shareholders, and agents, who were employed by

1   Red Granite on or before September 14, 2017,

2   whose identities and roles were disclosed

3   explicitly to the Government prior to the

4   execution of this Agreement.  The release

5   provided in this sub-paragraph is limited to such

6   people's work in connection with Red Granite, and

7   does not release such people in connection with

8   their work with or for any other entity or

9   person.

10   iii.   Any ownership interest in Red Granite held by its

11   shareholders, which was held on or before

12   September 14, 2017, and which Red Granite

13   disclosed explicitly to the Government prior to

14   the execution of this Agreement, *provided,*

15   *however*, that the pledge of Majority Shareholder

16   Assets described in Paragraphs 20-21 of the

17   Agreement, shall include the Majority

18   Shareholder's ownership interests in Red Granite;

19   iv.   Any property, real, personal, or intangible

20   (including intellectual property) in the custody,

21   control, or possession of Red Granite as of

22   September 14, 2017, and that Red Granite

23   disclosed explicitly to the Government prior to

24   the execution of the Agreement, and the proceeds

25   of such property;

26   v.   Any property derived from Red Granite's

27   intellectual property, including future works

28   based on that intellectual property and the

16

1                          proceeds payable from such works, that Red

2                          Granite owned on or before September 14, 2017,

3                          and disclosed explicitly to the Government prior

4                          to the execution of the Agreement;

5             vi.   Any property in the custody, control, or

6                          possession of any other person or entity that was

7                          received from Red Granite, including but not

8                          limited to payments made pursuant to agreements

9                          concerning motion picture proceeds, on or before

10                        September 14, 2017, and disclosed explicitly to

11                        the Government prior to the execution of the

12                        Agreement.

13           vii.   Current and future proceeds payable to Red

14                        Granite from motion pictures, including but not

15                        limited to "The Wolf of Wall Street," "Friends

16                        With Kids," "Dumb and Dumber To," "Horns," "Out

17                        of the Furnace," "Daddy's Home," and "Papillon,"

18                        as well as any projects of any kind (motion

19                        picture, television, or otherwise) under

20                        development or which Red Granite may be involved

21                        in developing in the future.

22         viii.   For the avoidance of doubt, the releases provided

23                        in the Agreement shall not include any asset that

24                        is currently subject to a civil forfeiture claim

25                        by the Government in any of the related cases

26                        pending in this District, other than the

27                        Defendant Assets.

28       b.    Any and all claims or defenses that Red Granite may or

could assert against the Government, including its agencies, agents, officers, employees and representatives, including, without limitation, all agents, officers, employees and representatives of the Federal Bureau of Investigation, the Internal Revenue Service, Criminal Investigation, as well as all agents, officers, employees and representatives of any state or local government or law enforcement agency involved in the investigation of this matter, related to the Covered Conduct or the Complaints, including any claims for reimbursement of funds expended on the Information Agent or Independent Operational Fiduciary, as those terms have been defined in prior orders of the Court.

23.   Prior to the execution of the Agreement, Red Granite provided to the Government a list of all assets to be released as part of the Settled Claims.  Any material asset not so identified shall not be released.

24.   With respect to the Settled Claims enumerated above and in Paragraphs 29 and 30 of the Agreement, the Government and Red Granite have acknowledged and agreed that the releases they give to each other, subject and pursuant to Paragraphs 29 and 30 of the Agreement, apply to all such claims known or unknown, foreseen, or patent or latent which either party may have against the other, and each party has thereby waived application of California Civil Code Section 1542, as set forth more completely in Paragraph 31 of the Agreement.

25.   Nothing in the Agreement shall be read to release any potential criminal claims of any kind against any person or entity.

1    Union Entities Claims

2        26.   Notwithstanding the foregoing, nothing in the Agreement

3    shall be construed to affect, release, or impair any existing or

4    future rights or claims that the Union Entities may have with respect

5    to motion pictures produced, distributed, or otherwise exploited by

6    Red Granite, which claims shall pass through unaffected by the

7    Agreement.

8    Hold Harmless

9        27.   With regard to the Covered Conduct, the United States shall

10   hold harmless any financial institution, as defined under Title 31,

11   Section 5312(a)(2), in connection with providing ordinary-course

12   banking services to Red Granite, including, without limitation:

13   providing access to or opening deposit accounts, custodial accounts,

14   investment accounts, check clearing or processing services, wire

15   transfer services, and secured or unsecured lending.  For the

16   avoidance of doubt, with regard to the Covered Conduct, the United

17   States shall hold harmless under this paragraph any such financial

18   institution, or any other entity in the business of extending credit

19   for motion pictures, for engaging in secured or unsecured lending

20   agreements with Red Granite in connection with motion pictures that

21   are under development or in production at the time of the Agreement,

22   or that come under development or enter into production in the

23   future.  As used in this sub-paragraph, an entity is "in the business

24   of extending credit for motion pictures" if it has been in the

25   principle business of motion picture finance for at least the 36

26   months period preceding the date of any proposed transaction and has

27   an established history of financing motion pictures that were

28   released in the United States.  With respect to any other potential

source of film financing (*i.e.*, from a source other than a financial institution or an entity in the business of extending credit for motion pictures, as defined herein), the Government may in its sole discretion, upon request by either Red Granite or the potential source of film financing, confirm that a financing transaction is subject to the hold harmless provision of this sub-paragraph if Red Granite identifies the source of those funds and provides to the Government sufficient information to satisfy the Government as to the legitimacy of any and all sources of such funds.  For the avoidance of doubt, neither Red Granite nor any potential financier is required to seek such confirmation from the Government, but may do so at their sole election.

28.  With regard to the Covered Conduct, the United States likewise shall hold harmless any studio, distributor, trade vendor, Union Entity, professional firm, or any other person as a result of engaging in ordinary-course business dealings with Red Granite.  For the avoidance of doubt, such ordinary-course business dealings expressly includes but is not limited to the remittance of payments by any motion picture studio or taxing authority in accordance with the provisions below.

29.  Notwithstanding any provision to the contrary, the hold harmless provisions of the Agreement apply purely prospectively, and do not release any individual or entity for historical conduct.

30.  However, subject to Paragraph 38 of the Agreement, certain financial institutions, studios, distributors, trade vendors, Union Entities, professional firms, and other third parties that may have relied upon the prior orders in the Actions holding them harmless in connection with their business with Red Granite (*i.e.*, the

Collections Orders, as defined below) may continue to rely on those orders, whose hold harmless provisions remain in full force and effect.

31.  For the avoidance of doubt, nothing in the Agreement relieves any financial institution, as defined in Paragraph 34 of the Agreement, of their obligation to monitor transaction activity in accordance with their obligations under the Bank Secrecy Act, comply with anti-money laundering laws (including 18 U.S.C. §§ 1956 and 1957), and file Bank Secrecy Act reports, as appropriate and in the ordinary course of that financial institution's business.  No financial institution shall be required to file Bank Secrecy Act reports for ordinary-course transactions involving Red Granite or its Shareholders, or to otherwise file any Bank Secrecy Act reports, solely because Red Granite or its Shareholders are a party to a transaction.

Third Parties Permitted to do Business

32.  All third parties are permitted to continue making payments to, receiving payments from, and doing business with Red Granite under any agreements that were executed on or before September 14, 2017, or which may be executed between September 14, 2017, and the date on which Red Granite completes payment of the Forfeiture Amount, and were disclosed explicitly to the Government, subject to the hold-harmless provisions.

33.  For the avoidance of doubt, and without limiting the scope of either the above language or the language of the hold-harmless provisions (*i.e.*, paragraphs 34-38 of the Agreement):

a.  Any studio, distributor, trade vendor, professional firm, or trade organization is permitted to make payments to and

do business with Red Granite, subject to the hold-harmless provisions, including but not limited to Paramount; Universal Pictures, a division of Universal City Studios LLC; Sony Pictures Entertainment; Twentieth Century Fox Film Corporation; Warner Bros. Entertainment Inc.; Lions Gate Films Inc.; the Screen Actors Guild-American Federation of Television and Radio Artists; the Directors Guild of America, Inc.; the Writers Guild of America West, Inc.; the Writers Guild of America East, Inc.; the International Alliance of Theatrical Stage Employees; the International Brotherhood of Teamsters Studio Transportation Drivers; and the Motion Picture Industry Pension and Health Plans;

b.   Any financial institution, as defined in Paragraph 34 of the Agreement, that provides banking services of any kind to Red Granite or its Shareholders, in their corporate or individual capacities, is expressly permitted to do so, subject to the hold-harmless provisions.

34.   Notwithstanding anything else in this Consent Judgment or the Agreement, other than what is required by existing law or regulations, the Agreement imposes absolutely no prohibition, restriction, or limitation whatsoever on any third party's right or ability to conduct business with Red Granite.  Neither the Court nor the Government have imposed any prohibition, restriction, or limitation on Red Granite's business or the right or ability of third parties to conduct business with Red Granite.  No such prohibition, restriction, or limitation should be implied from the Actions, the Complaints, the Agreement, or this Consent Judgment.

1  <u>Payments by Third Parties</u>

2      35.  For the avoidance of doubt, with regard to the Covered

3  Conduct:

4          a.  All third parties obligated to pay proceeds from "The

5              Wolf of Wall Street" and "Dumb and Dumber To" into the

6              Collection Account (as defined in the Court's orders

7              dated August 16, 2016 [ECF No. 30], and July 7, 2017

8              [ECF No. 114] in case number 16-cv-5362-DSF (PLAx),

9              and the substantially identical order in case number

10             17-cv-4439-DSF (PLAx) (collectively, the "Collections

11             Order")) are expressly permitted and (subject to the

12             limits of this Court's jurisdiction) ordered to do so

13             without interruption, subject to the hold-harmless

14             provisions and the terms of the Agreement; such third

15             parties may include but are not limited to Paramount

16             Pictures Corporation; Universal Pictures, a division

17             of Universal City Studios LLC; and any taxing

18             authority.

19         b.  All third parties obligated to pay proceeds from

20             "Friends With Kids" into the FWK Collection Account

21             (as defined in the Collections Order) are expressly

22             permitted and (subject to the limits of this Court's

23             jurisdiction) ordered to do so, subject to the hold-

24             harmless provisions and the terms of this Agreement;

25             such third parties may include but are not limited to

26             Lions Gate Films Inc.; and any taxing authority.

27         c.  All third parties obligated to pay to Red Granite or

28             its assigns (including, without limitation, collateral

assignees) the proceeds of motion pictures other than "The Wolf of Wall Street," "Dumb and Dumber To," or "Friends With Kids" (including, without limitation, "Horns," "Out of the Furnace," "Daddy's Home," and "Papillon"), including but not limited to Paramount Pictures Corporation, are expressly permitted and (subject to the limits of this Court's jurisdiction) ordered to do so subject to the hold-harmless provisions and the terms of this Agreement, and Red Granite or its assigns (including, without limitation, collateral assignees) are permitted to receive such proceeds.

36.   Any restraints imposed by the Collections Order, including with respect to the Collection Account and the FWK Collection Account are dissolved.  For the avoidance of doubt, Fintage Collection Account Management B.V. may release any funds from the Collection Account and the FWK Collection Account due to Red Granite, pursuant to the terms of any applicable Collection Account Management Agreement(s).

Binding Effect; Benefits

37.   The Agreement and the Consent Judgment shall be binding upon and inure to the benefit of each of the parties and their successors and assigns.

Court Approval; Good Faith

38.   Notwithstanding any provision to the contrary, the Agreement is expressly subject to and contingent upon approval of the Court.  If the Agreement, or any portion thereof, is rejected by the Court or is overturned or modified on appeal, the parties shall

negotiate in good faith to revise the terms of the Agreement such that it can be approved.

39. During any period that the Agreement is not in force, neither the Agreement nor any negotiations or writings in connection therewith shall in any way be construed as or deemed to be evidence of an admission on the part of any Party regarding any claim, right, or defense that such Party may have against any other Party.

40. Notwithstanding the previous paragraph, any third party is entitled to reasonably rely on the hold-harmless provisions for actions taken while the Agreement is not in force.

<u>Miscellaneous</u>

41. This Consent Judgment shall be the final and complete satisfaction of the claims asserted by the United States and Red Granite. Red Granite shall, individually and jointly, not seek, through any court proceeding or other process, the return of the Forfeiture Amount except as otherwise provided herein. Except as otherwise provided for in the Agreement, the parties' rights to further litigate against each other their respective interests in the Forfeiture Amount or to petition for remission or mitigation of the settlement, releases, or forfeiture is waived.

42. All parties shall bear their own fees and costs. The parties have waived any and all claims for attorney's fees and costs. For the avoidance of doubt, notwithstanding the provisions of Title 28, United States Code, Section 2465, or any other "cost" or "fee-shifting" statute or regulation, Red Granite expressly has waived any right to seek any fees or expenses incurred by Red Granite related to the seizure and/or forfeiture of the Defendant Assets.

43. Red Granite shall not, through present or future attorneys,

officers, directors, employees, agents or any other person authorized to speak for Red Granite issue any press release contradicting or that is inconsistent with this Consent Judgement or the Agreement. At least 48 hours prior to any Red Granite press release related to this Consent Judgment or the Agreement, Red Granite shall provide to the Government an advance copy of such press release.

44.   The Agreement, and any dispute arising thereunder, shall be governed by the laws of the United States and the laws of the State of California.   This Court shall retain jurisdiction to enforce the Agreement and this Consent Judgment.

45.   In the event that any disputes arise about the interpretation of or compliance with the terms of the Agreement or this Consent Judgment, the parties shall endeavor in good faith to resolve any such disputes between themselves before bringing it to the Court for resolution.   However, in the event of either a failure by one of the parties to the Agreement to comply with its terms or an act by one of the parties in violation of any provision hereof, the parties may move this Court to impose any remedy authorized by law or equity.

//

//

46.   There shall be no modification of the Agreement unless in writing and signed by all the parties to the Agreement or their authorized representatives, *provided, however*, that the signature of a representative of the Union Entities and/or Paramount shall not be necessary to modify the Agreement unless the proposed modification would have the effect of impairing any rights the Union Entities and/or Paramount may have or assert.

DATED: 3/8/18 _____

_____
UNITED STATES DISTRICT JUDGE

PRESENTED BY:

DEBORAH CONNOR, Acting Chief
Money Laundering and Asset Recovery Section (MLARS)
WOO S. LEE
JONATHAN BAUM
BARBARA LEVY
Criminal Division
U.S. Department of Justice

NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section

_____
JOHN J. KUCERA
JONATHAN GALATZAN
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA